UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED SATES OF AMERICA | ) ) ) |
| v. | ) ) |
| ROSE ASANG GANA, also known as "ROSE NEBANGU," | ) ) ) ) |
| Defendant. | ) ) |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT

### I.  IDENTITY OF THE AFFIANT

I, Jynika Craig, being duly sworn, state:

1. I am a Special Agent of the Federal Bureau of Investigation (hereinafter "FBI"). From 2015 to the present, I have been assigned to a white-collar crime squad at the FBI's Washington Field Office in the District of Columbia (D.C.), specifically focused on the investigation of health care fraud and other health care crimes. My investigative focus during the past two years has been on fraud against government programs. I have received training in general law enforcement and criminal investigations, and I have attended training programs focused on health care crimes. I have investigated allegations of health care fraud, false claims, and money laundering.

2. I am assigned to this investigation and my involvement has included, but is not limited to, interviewing witnesses, reviewing Medicaid billing claims and medical records associated with Medicaid recipients, as well as conducting surveillance.

## II. REASON FOR AFFIDAVIT

3. This affidavit is made in support of a criminal complaint and arrest warrant charging ROSE ASANG GANA ("GANA"), also known as "ROSE NEBANGU," with violations of 18 U.S.C. § 1347 (Health Care Fraud), 18 U.S.C. § 1035 (Health Care False Statements) and 42 U.S.C. §§ 1320a, 1320(b), 1320(f)(1 – 2) (Anti-Kickback).

4. GANA is a naturalized American citizen, who resides in Greenbelt, Maryland. Since approximately October 2013, through the present, GANA was employed as a Personal Care Aide ("PCA") providing home health services to residents of the District of Columbia that receive Medicaid. GANA used a unique National Provider Identifier ("NPI") Number to submit timesheets to home health agencies ("HHA") that in turn billed Medicaid and paid GANA.

5. In or around October 2015, the FBI along with the D.C. Department of Health Care Finance ("DHCF"), Department of Health & Human Services ("DHHS"), Office of Inspector General ("HHS-OIG"), and the D.C. Medicaid Fraud Control Unit ("MFCU"), opened an investigation into allegations surrounding one of the HHAs that employed GANA as a PCA. It was alleged that the HHA had defrauded the D.C. Medicaid program by submitting and causing to be submitted false claims concerning the provision of PCA services. During the course of the investigation into the HHA, law enforcement identified GANA as a PCA employed by the HHA, who was causing false claims to be submitted under her NPI number.

6. The investigation confirmed those allegations, revealing that GANA had been submitting false claims that can be categorized broadly as follows: (1) claims purporting that GANA provided services in excess of 20 hours in a given day; (2) claims purporting that GANA provided services to multiple Medicaid beneficiaries in overlapping hours for different HHAs; (3) claims purporting that GANA provided services to Medicaid beneficiaries to whom she

2

provided no care at all; (4) claims purporting that GANA provided services to Medicaid beneficiaries while she was not in the United States; and (5) claims that were tainted by the payment of illegal kickbacks to Medicaid beneficiaries to secure their signatures on fraudulent timesheets.

7. Based on a review of Medicaid billing claims submitted under GANA's NPI number for a period of approximately sixty-three (63) months, between on or about October 1, 2013, and December 28, 2018, Medicaid paid for 91,882 units (or 22,970.5 hours) of PCA services allegedly provided by GANA at a loss of $441,234.64.

8. One "unit" of PCA care is equivalent to 15 minutes. There are four units in an hour and 96 possible units in a 24-hour period. A review of GANA's claims data shows that she attempted to bill for as many as 128 units (or 32 hours) of work on a single day.[1]

9. The claims data further showed that during that period, GANA was employed by approximately nine HHAs: HHA-1 through HHA-9 (collectively the "nine HHAs"). The nine HHAs were registered to do business in the District of Columbia to provide home health services to Medicaid beneficiaries. GANA also purported to provide PCA services for up to eighteen (18) different Medicaid beneficiaries in that time period.

10. The facts and information contained in this affidavit are based on my personal knowledge of the investigation and the observations and reports of other law enforcement officers. This affidavit does not include every fact and matter observed by me or known to the government relating to the subject matter of this investigation. Instead, this affidavit contains only those facts that are necessary to establish that probable cause exists.

---

[1] From October 21, 2013, to November 3, 2013, GANA submitted timesheets on which she purported to provide PCA services to four beneficiaries a day for eight hours each. However, D.C. Medicaid only paid the claims for three of the four beneficiaries.

### III. OVERVIEW OF DISTRICT OF COLUMBIA MEDICAID PROGRAM AND HOME HEALTH CARE SERVICES

11. Medicaid is a health insurance program established by Congress under Title XIX of the Social Security Act of 1965 (the "Medicaid Act"). Medicaid was overseen and administered by the Centers of Medicare and Medicaid Services ("CMS"), an agency within the United States Department of Health and Human Services ("HHS"). The federal government provides the funding for 70 – 80% of Medicaid and the District provides the remaining funds. Through September 30, 2008, Medicaid was administered by D.C.'s Department of Health's Medical Assistance Administration; however, since October 1, 2008, Medicaid has been administered by DHCF. Medicaid provides health insurance coverage to residents of D.C. whose incomes are below a certain financial threshold as measured against the poverty line. Recipients of medical services covered by Medicaid are referred to as "beneficiaries." In the District of Columbia, a beneficiary is assigned a DCID, a unique 8-digit number that is used to bill Medicaid for services provided to the beneficiary.

12. In the District of Columbia, HHAs can provide certain services including skilled nursing, home health aide, and personal care services. Personal care services are intended to assist Medicaid beneficiaries in performing the activities of daily living, known as "ADLs." ADLs include the ability to get in and out of bed, bathe, dress, eat out, take medication prescribed for self-administration, and engage in toileting.

13. To be eligible to participate in Medicaid, HHAs must agree to abide by all federal and local laws, regulations, and program manuals governing Medicaid reimbursements. To receive reimbursement from Medicaid, HHAs operating in D.C. are required to submit a claim, either electronically or in paper form, to DHCF. As part of the claim, an HHA must provide certain information, such as the name of the Medicaid beneficiary, the date of service, the type of

service and corresponding billing code, the amount of time a service was provided, and the amount of money being claimed by the HHA as payment from Medicaid. Medicaid only pays for services that are medically reasonable and necessary, and that are actually provided as claimed.

14.   HHAs employ and contract with personal care aides ("PCAs") to provide services to Medicaid beneficiaries. Under the Medicaid rules, a PCA must meet certain qualifications. Those qualification include: (a) being at least 18 years of age; (b) a citizen of the United States or an alien who is lawfully authorized to work in the United States; (c) completing a home health aide training program that involves at least seventy-five (75) hours of classroom training with at least sixteen (16) hours devoted to supervised practical training; (d) passing a competency evaluation for the services which the PCA is required to perform consistent with the requirements set forth in 42 C.F.R. § 484.36; (e) obtaining certification in cardiopulmonary resuscitation and maintaining such certification annually; (f) demonstrating that the PCA is free from communicable disease as confirmed by an annual PPD Skin Test or documentation from a primary care physician stating that the person is free from communicable disease; and (g) passing a criminal background check. PCAs are issued a unique 10-digit National Provider Identification number, the "NPI," which the HHA uses to bill Medicaid for services rendered to a beneficiary based on timesheets submitted by the PCA.

15.   To receive personal care services under Medicaid, a beneficiary must obtain a prescription from a doctor, informally known as an "intake." Medicaid only pays for personal care services if the doctor determines after a face-to-face physical examination that the beneficiary has functional limitations in one or more ADLs. DHCF regulations that went into effect in November 2013, clarified that the doctor prescribing the intake must be the beneficiary's primary care physician with whom the beneficiary had a pre-existing doctor-patient

relationship.

16. A beneficiary takes the intake to a HHA that in turn arranges for a registered nurse to perform an initial assessment of the beneficiary's functional status and needs. The nurse drafts a Plan of Care ("POC") for the beneficiary based on the assessment. The POC is required to specify the frequency, duration, and expected outcome of the personal care services and is supposed to be tailored to address the individual needs of the beneficiary.

17. The HHA then assigns a PCA to provide the personal care services set forth in the POC to the beneficiary. Services typically are provided in the beneficiary's home and PCAs must document the provided care on a timesheet that is submitted to the HHA. The timesheet is supposed to reflect accurately the date the PCA provided services, the itemized services rendered, the amount of time spent providing each service, and the location at which the services were provided. Timesheets are supposed to be signed each day by both the PCA and the beneficiary. However, a single timesheet can contain a full week of services. HHAs use the timesheets to determine and justify the hours of services for which the HHA files a reimbursement claim with Medicaid.

18. Chapter 50, Title 29, of the District of Columbia Municipal Regulations (DCMR), entitled Medicaid Reimbursement for Personal Care Services, states that "PCA services shall not be provided in a hospital, nursing facility, intermediate care facility, or other living arrangement which includes personal care as part of the reimbursed service."

19. As outlined in Section 6.3 Interrelationship of Providers, of the D.C. Medicaid MMIS Provider Billing Manual, "Providers are prohibited from referring or soliciting beneficiaries directly or indirectly to other providers for financial consideration. Providers are also prohibited from soliciting, receiving or offering kickbacks; payments, gifts, bribes, or

rebates for purchasing; leasing, ordering, arranging for, recommending purchasing, leasing; ordering for goods, facilities, or items for which payment is made through the D.C. Medicaid Program."

## IV. FACTS SUPPORTING PROBABLE CAUSE

20. As mentioned above, the investigation revealed that GANA submitted or caused to be submitted false timesheets to several HHAs for payment for PCA services not rendered to beneficiaries. The HHAs subsequently sought and received payments from D.C. Medicaid based on GANA's fraudulent timesheets, and in turn paid her.

21. During the course of the investigation, law enforcement obtained, *inter alia*, GANA's bank records, payroll records, phone records, employment records, patient files, and D.C. Medicaid billing claims submitted with her NPI numbers ending in -3395. Law enforcement also interviewed witnesses, conducted surveillance on GANA during hours that she purported to provide PCA services, and interviewed GANA who admitted to falsifying timesheets.

22. A review of the D.C. Medicaid claims data for GANA's NPI ending in -3395, revealed that she was employed by at least nine HHAs and purported to provide PCA services to up to eighteen (18) different Medicaid beneficiaries from on or about October 1, 2013 to January 6, 2019. GANA's fraudulent Medicaid claims are too numerous to recite in full in this Affidavit. However, for purposes of establishing probable cause, the exemplars set forth in Paragraphs 23 through 34, demonstrate, but are not an exhaustive list of, the fraud GANA committed against D.C. Medicaid.

7

**Billing Exceeding 20 Hours Daily and Overlapping Hours of Care**

23. A review of D.C. Medicaid claims data for GANA revealed that she frequently submitted timesheets purporting to work more than 20 hours a day. For instance, a review of Medicaid claims data for GANA from October 20, 2013, through November 2, 2014, showed that GANA submitted timesheets claiming that she provided *twenty hours or more* of PCA services to several Medicaid beneficiaries for several HHAs, each day. During this timeframe, D.C Medicaid was billed and paid HHAs on GANA's behalf, approximately $31,000. That amount included *148 days* on which GANA purportedly worked between *20 and 24 hours* each day for *as few as three and as many as four beneficiaries,* and for between *two to four HHAs,* often during overlapping hours. Medicaid prohibits PCAs from providing services to more than one beneficiary at a time.

24. On June 7, 2014, GANA caused D.C. Medicaid to be billed for 96 units (or 24 hours) of PCA services for *three* beneficiaries associated with *two* HHAs. A review of the timesheets submitted by GANA showed that she allegedly provided PCA services to two of the three beneficiaries during *overlapping hours* of services. Table 1 below summarizes the entries from Gana's timesheets and the corresponding Medicaid data from June 7, 2014.

**TABLE 1**

| Date of Service | Timesheet Beg Time | Timesheet End Time | Home Health Agency | Beneficiary | Hours of Work Claimed | Amount Paid |
|---|---|---|---|---|---|---|
| June 7, 2014 | 7:00:00 AM | 3:00:00 PM | INTEGRATED | B-1 | 8 | $139.20 |
|  | 4:00:00 PM | 12:00:00 AM | LIFELINE | B-2 | 8 | $139.20 |
|  | 7:00:00 AM | 3:00:00 PM | JD NURSING | B-3 | 8 | $139.20 |
| 7-June Total |  |  |  |  | 24 | $417.60 |

25. Similarly on June 14, June 15, July 5, and July 6, 2014, GANA billed for *three* beneficiaries, B-1, B-2, and B-3, through *three* HHAs, for a total of 480 units (or 120 hours) of

8

care across a total of four days.[2]

**TABLE 2**

| Date of Service | Timesheet Beg Time | Timesheet End Time | Home Health Agency | Beneficiary | Hours of Work Claimed | Amount Paid |
|---|---|---|---|---|---|---|
| June 14, 2014 | 7:00:00 AM | 3:00:00 PM | INTEGRATED | B-1 | 8 | $139.20 |
| | 4:00:00 PM | 12:00:00 AM | LIFELINE | B-2 | 8 | $139.20 |
| | 7:00:00 AM | 3:00:00 PM | JD NURSING | B-3 | 8 | $139.20 |
| June 15, 2014 | 7:00:00 AM | 3:00:00 PM | INTEGRATED | B-1 | 8 | $139.20 |
| | 4:00:00 PM | 12:00:00 AM | LIFELINE | B-2 | 8 | $139.20 |
| | 7:00:00 AM | 3:00:00 PM | JD NURSING | B-3 | 8 | $139.20 |
| July 5, 2014 | 7:00:00 AM | 3:00:00 PM | INTEGRATED | B-1 | 8 | $139.20 |
| | 4:00:00 PM | 12:00:00 AM | LIFELINE | B-2 | 8 | $139.20 |
| | 7:00:00 AM | 3:00:00 PM | JD NURSING | B-3 | 8 | $139.20 |
| July 6, 2014 | 7:00:00 AM | 3:00:00 PM | INTEGRATED | B-1 | 8 | $139.20 |
| | 4:00:00 PM | 12:00:00 AM | LIFELINE | B-2 | 8 | $139.20 |
| | 7:00:00 AM | 3:00:00 PM | JD NURSING | B-3 | 8 | $139.20 |
| Total Across 4 Days | | | | | 120 | $1670.40 |

26. A review of the timesheets GANA submitted for B-1, B-2, and B-3, for the dates identified in Table 2, showed *overlapping hours* of care. Based on D.C. Medicaid claims data for these four days, GANA caused a loss of $1,670.40 to the Medicaid program.

### Payment of Kickbacks to Beneficiaries

27. GANA also caused the submission of claims to D.C. Medicaid for PCA services she did not provide and that were tainted by unlawful kickback arrangements with at least three identified beneficiaries.

28. On June 4, 2016, law enforcement interviewed GANA. She admitted that she paid B-3, B-4, and B-5, to sign timesheets for days that she did not provide them with any PCA services. An analysis of D.C. Medicaid claims, from the period of October 1, 2013, through

---

[2] There are only 96 hours or 384 units in a four-day period.

September 27, 2015, showed that GANA caused a loss to Medicaid of approximately $94,803.24 for services that were not provided to B-3, B-4, and B-5, and that were tainted by the payment of unlawful kickbacks.

29. On January 31, 2019, law enforcement interviewed B-6, who indicated that GANA was supposed to provide it with PCA services eight hours a day, seven days a week. Instead, B-6 said that GANA paid it $200 every two weeks to sign timesheets for days she did not go to work. B-6 said that it would meet GANA outside of its residence to receive payments and that the payment arrangement had been ongoing since GANA was assigned to provide B-6 with PCA services. A review of D.C. Medicaid claims revealed that GANA started billing for B-6 on or about September 2, 2015. At the time, GANA already was billing daily for two other beneficiaries, making B-6 her third full-time, daily client. According to the submitted Medicaid claims, from September 2, 2015, through December 14, 2018, GANA caused D.C. Medicaid to be billed and pay for approximately $107,327 in PCA services that were not provided and were tainted by the payment of illegal kickbacks to B-6.

### Billing During Patient Hospitalization

30. GANA also caused the submission of false claims to D.C. Medicaid for PCA services she did not to provide during the hospitalization of at least one beneficiary.

31. From on or about July 4, 2015, through July 5, 2015, B-7 was admitted to George Washington University Hospital. A review of D.C. Medicaid claims data for those dates revealed that GANA billed Medicaid for eight hours of PCA services she purportedly provided to B-7, causing a loss to Medicaid of approximately $151.

### Billing for Services Not Rendered

32. On December 22, 2016, law enforcement conducted surveillance from

approximately 5:50 a.m. to 4:23 p.m. at the residence of B-8 in Southeast, Washington, D.C. GANA purported to provide PCA services to B-8 from 7:00 a.m. to 3:00 p.m. At approximately 10:39 a.m., law enforcement called B-8 who refused to discuss GANA and stated that it did not have a PCA and did not receive home health services. At approximately 4:32 p.m., law enforcement called B-8 again. During the second telephone call, B-8 reported it was at a meeting and did not want to discuss its PCA. Throughout the duration of the surveillance, GANA was not observed at or in the vicinity of B-8's residence. An analysis of D.C. Medicaid claims data for December 22, 2016, showed that GANA caused D.C. Medicaid to be billed approximately $160 for eight hours of PCA services she purportedly provided to B-8 from 7:00 a.m. to 3:00 p.m.

33.  On March 15, 2017, law enforcement conducted surveillance on GANA at her residence in Greenbelt, MD, beginning at or around 7:50 a.m. At or around 11:00 a.m., GANA was observed departing her residence in a white Toyota 4Runner, bearing Maryland license plate number 2CD5115[3] (hereafter "Target Vehicle") and arriving at Foodway supermarket located at 8484 Annapolis Road, New Carrollton, MD. A review of the surveillance footage from Foodway revealed that GANA entered the grocery store at or around 11:03 a.m. and checked out at a register at or around 11:27 a.m. At or around 11:30 a.m., law enforcement observed GANA loading groceries into the Target Vehicle and subsequently returning to her residence in Greenbelt, MD, at or around 12:05 p.m. There is no indication that GANA left her residence after returning from the supermarket and prior to law enforcement terminating surveillance at or around 3:35 p.m., as the Target Vehicle was still present. An analysis of D.C. Medicaid claims data for March 15, 2017, revealed that GANA caused D.C. Medicaid to be billed $323.20 for

---

[3] This vehicle previously was identified by your Affiant as being registered to GANA in the state of Maryland.

sixteen hours of PCA services that she purportedly provided to B-8 from 7:00 a.m. to 3:00 p.m., and to B-6 from 4:00 p.m. to 12:00 a.m.

34.     On April 12, 2017, law enforcement conducted surveillance on GANA at her residence in Greenbelt, MD, beginning at or around 5:30 a.m. At or around 10:37a.m., GANA was observed departing her residence in the Target Vehicle. At or around 11:16 a.m., GANA was observed arriving at and entering KBC NURSING, an HHA located at 7506 Georgia Avenue N.W., Washington, D.C. At or around 11:33 a.m., GANA was observed departing KBC NURSING. At or around 12:04 p.m., GANA was last observed at a McDonald's restaurant located at 6219 Greenbelt Road, Greenbelt, MD. A review of D.C. Medicaid claims data for April 12, 2017, revealed that GANA caused D.C. Medicaid to be billed $323.20 for sixteen hours of PCA services she purportedly provided to B-8 from 7:00 a.m. to 3:00 p.m., and to B-6 from 4:00 p.m. to 12:00 a.m.

### Receipt of Payment for Services Not Rendered

35.     Further, GANA accepted payments from the HHAs based on the fraudulent timesheets that she caused to be submitted to D.C. Medicaid for work she did not perform. A review of payroll records for six of the nine HHAs that employed GANA, reflect disbursements to her of approximately $213,000 from the period of October 23, 2013, through October 2, 2018.

36.     A review of payroll checks written to GANA show that she cashed a majority of the checks at check cashing and non-bank institutions. Your affiant is aware from its experience and training that PCAs often cash their HHA paychecks at non-bank institutions shortly after receiving them to avoid the check bouncing and to, among other things, prevent the tracing of the fraudulently obtained funds.

## Contact with Beneficiaries

37. Telephone records associated with GANA's known telephone number (XXX-XXX-3295) demonstrate that she knew and had telephonic contact with at least six of the beneficiaries she purportedly provided with PCA services: B-2, B-3, B-5, B-6, B-7, and B-8.

38. Telephone records from May 1, 2016 through March 22, 2017, were crossed referenced with eleven possible telephone numbers for ten of GANA's beneficiaries. During the aforementioned period, GANA was billing D.C. Medicaid for eight beneficiaries. Further analysis revealed that in that ten-month period, there were over 300 instances of telephonic contact between GANA and six of the beneficiaries.

[Text Continues On Next Page]

## V. CONCLUSION

39. Based on the foregoing facts and information gathered thus far in the investigation, and an analysis of the claims submitted under GANA's NPI number ending in -3395, there is probable cause to believe that from on or about October 2013, through on or about December 2018, in the District of Columbia and elsewhere, GANA knowingly and intentionally submitted false timesheets to HHAs that caused D.C. Medicaid to be billed and GANA to be paid, for PCA services she did not provide or that were tainted by the payment of illegal kickbacks.[4] GANA's conduct constitutes Health Care Fraud, in violation of 18 U.S.C. § 1347, and Health Care False Statements, in violation of 18 U.S.C. § 1035, as well as violates the Anti-Kickback Statute, 42 U.S.C. §§ 1320a, 1320(b), 1320(f)(1 – 2), and caused the D.C. Medicaid program to suffer an approximate loss of **$441,234.64.**

Special Agent Jynika Craig
Federal Bureau of Investigation

**Sworn to and subscribed before me this _____ day of March 2019.**

Magistrate Judge

---

[4] GANA is still actively purporting to provide PCA services to two beneficiaries through two HHAs.